**Reversed and Remanded and Memorandum Opinion filed August 11, 2022.**



In The

# Fourteenth Court of Appeals

### NO. 14-20-00699-CV

### IDEXX LABORATORIES, INC., Appellant

### V.

### THE BOARD OF REGENTS OF THE UNIVERSITY OF TEXAS SYSTEM, Appellee

**On Appeal from the 189th District Court**
**Harris County, Texas**
**Trial Court Cause No. 2018-08064**

## MEMORANDUM OPINION

In this dispute over royalties contractually owed for veterinary-testing products, appellant IDEXX Laboratories, Inc. appeals the trial court's final judgment in favor of appellee The Board of Regents of The University of Texas System. In three issues, IDEXX argues the trial court erred by determining, as a matter of law, that (1) the parties' patent-license agreement unambiguously required IDEXX to pay the Board a 2.5% royalty on the products in question, (2) the license agreement required IDEXX to pay 18% interest, and (3) IDEXX

was barred from asserting its equitable defenses. We sustain issue 1 and, without reaching issues 2 and 3, reverse the trial court's judgment and remand the case to the trial court for further proceedings.

## I.   BACKGROUND

IDEXX and the Board signed a patent-license agreement providing for royalties to be paid by IDEXX to the Board on certain veterinary-testing products. Section 5.1(b) of the agreement requires IDEXX to pay the Board (i) 4% of net sales on products testing only for Lyme disease, (ii) .5% to 1%[1] of net sales on products that test for Lyme disease in addition to "one other" disease, with heartworm given as an example, and (iii) 2.5% of net sales on products that test for Lyme disease in addition to one or more tick-borne diseases.

The three products at issue in this lawsuit are referred to by the parties as the "SNAP" products. The parties agree that the SNAP products each test for (1) Lyme disease, (2) heartworm, which the parties do not dispute is borne by mosquitoes and not ticks, and (3) one or more additional tick-borne diseases.

IDEXX paid the Board a .5% royalty on the SNAP products, as provided by subsection ii of the agreement. The Board sued, claiming it was entitled to a 2.5% royalty on the SNAP products as provided by subsection iii of the agreement. The trial court rendered partial summary judgment that the agreement unambiguously required IDEXX to pay a 2.5% royalty on the SNAP products under subsection iii. After additional interlocutory summary-judgment orders on interest and IDEXX's defenses, as well as stipulations by the parties as to attorney's fees and costs, the trial court signed an omnibus final judgment in the Board's favor without a

---

[1] Subsection ii of the agreement provides for a 1% royalty but allows for deductions of up to .5% if royalty payments are also due to a third party for the product in question.

conventional trial on the merits.[2]

## II.  ANALYSIS

In issue 1, IDEXX argues that the trial court erred by rendering partial summary judgment that the license agreement unambiguously provided for a 2.5% royalty for the SNAP products. If a contract can be given a certain or definite legal meaning or interpretation, then it is not ambiguous, and the court will construe it as a matter of law. *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983). If, however, a contract is susceptible to more than one reasonable interpretation, it is ambiguous. *American Mfrs. Mut. Ins. Co. v. Schaefer*, 124 S.W.3d 154, 157 (Tex. 2003). When a contract is ambiguous, summary judgment is improper because the interpretation of the contract becomes a fact issue. *Coker*, 650 S.W.2d at 394.

Here, the parties dispute whether the SNAP products fall under subsection ii or iii of section 5.1(b) of the license agreement, which provides:

> b. Beginning upon University's receipt of a notice of allowance from either the US Patent and Trademark Office or a foreign patent office for a patent application containing a Valid Claim covering a Licensed Product, a running royalty as follows:
>
>> i. Four percent (4.0%) of Net Sales for all Licensed Products Sold to detect Lyme disease alone.
>>
>> ii. One percent (1.0%) of Net Sales for all Licensed Products Sold to detect Lyme disease in combination with one other veterinary diagnostic test or service (for example, but not limited to, a canine heartworm diagnostic test or service). Such royalty rate shall be reduced by a percentage rate equal to the percentage rate paid to a third party, other than sublicensees and Affiliates, for products or components used by IDEXX exclusively in the production or Sale of the Licensed Product. However, the total reduction of the royalty rate shall not exceed one-half percent (0.5%).

---

[2] The trial court's final judgment states, "This judgment finally disposes of all claims and parties and is appealable." *See Lehmann v. Har-Con Corp.*, 39 S.W.3d 191, 206 (Tex. 2001).

iii. Two and one-half percent (2.5%) of Net Sales for all Licensed Products Sold as a product or service to detect Lyme disease in combination with one or more veterinary diagnostic products or services to detect tick-borne disease(s).

Neither subsection ii nor subsection iii specifically addresses a product like the SNAP products, which each contain tests for, in addition to Lyme disease, (1) heartworm, which is specified as falling under subsection ii, and (2) one or more tick-borne diseases, which are specified in subsection iii.

The Board argues that the SNAP products cannot fall under subsection ii, because subsection ii covers only products that contain, in addition to Lyme disease, "one other" test, while each SNAP product contains at least two other tests in addition to Lyme disease. Instead, the Board argues that the SNAP products must fall under subsection iii, because each SNAP product contains at least one test for a tick-borne disease, which are only referenced in subsection iii.

This argument, however, ignores the fact that subsection iii says nothing about heartworm, a test that is specified as falling under subsection ii. While such a test could potentially fall under subsection iii, the plain language of the agreement does not unambiguously mandate that such a product *must* fall under subsection iii, particularly when the SNAP products include a test listed as falling under subsection ii.

Moreover, the Board's own logic potentially leads to a different, equally reasonable reading and result. The Board argues that, under the canon that "a specific contract provision controls over a general one," a product that tests for Lyme disease in addition to one other tick-borne disease would fall under subsection iii, which specifies it covers tick-borne diseases, and not subsection ii, which merely states it covers "one other" test. *Pathfinder Oil & Gas, Inc. v. Great W. Drilling, Ltd.*, 574 S.W.3d 882, 889 (Tex. 2019). Following that argument to its

4

logical conclusion, and reading subsections ii and iii in conjunction with one another, subsection ii must cover products that test for Lyme disease in addition to one *non-tick-borne* disease, while subsection iii covers products that test for Lyme disease in addition to one or more tick-borne diseases. Under that scenario, the SNAP products fall under the plain language of both subsection ii and subsection iii, because they each test for, in addition to Lyme disease, one non-tick-borne disease (heartworm, per subsection ii) and one or more tick-borne diseases (per subsection iii). The agreement does not state what royalty applies when products satisfy both the criteria of subsection ii and subsection iii, yet also contain services specified in the other subsection, as the SNAP products do.

Because the agreement is susceptible to more than one reasonable interpretation, it is ambiguous as to what royalty rate applies to the SNAP products. *See American Mfrs.*, 124 S.W.3d at 157. Accordingly, the trial court reversibly erred by rendering partial summary judgment that the agreement unambiguously mandated a 2.5% royalty as to the SNAP products. *See Coker*, 650 S.W.2d at 394.

We sustain issue 1. We do not reach issues 2 and 3 because they are not necessary for the final disposition of the appeal. *See* Tex. R. App. P. 47.1.

### III.  CONCLUSION

Having sustained issue 1, we reverse the trial court's judgment and remand the case to the trial court for further proceedings. Tex. R. App. P. 43.2(d).


/s/    Charles A. Spain
Justice

Panel consists of Justices Wise, Spain, and Hassan.

5